**In re OMNICOM GROUP, INC. SECURITIES LITIGATION.**

**This Document Relates to: All Cases.**

**No. 02 Civ. 4483(WHP).**

United States District Court, S.D. New York.

Jan. 29, 2008.

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge.

Plaintiffs bring this securities fraud class action pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 against Omnicom, Inc. ("Omnicom") and various members of its management (collectively, the "Defendants"). Plaintiffs assert that Omnicom (1) failed to write down internet investments it transferred to Seneca Investments LLC ("Sene-

ca"), a newly-formed entity (the "Seneca Transaction"); (2) improperly accounted for the transaction; and (3) failed to carry the value of Seneca on its books. Defendants move for summary judgment. For the following reasons, Defendants' motion is granted.

### BACKGROUND

The following facts are not in dispute. Omnicom is a global marketing and advertising holding company. On May 7, 2001, *Advertising Age* reported that "Omnicom Group shifted its minority stakes in Agency.com, Organic and Razorfish into a new E-services holding company to be co-managed with a venture capital unit of Pegasus Capital Advisors" and the "move was seen by some as a way for Omnicom to get struggling stocks off of its books." (Declaration of Jeff G. Hammel dated September 7, 2007 ("Hammel Decl.") Ex. 04: Debra Aho Williamson, "The Fairy Tale Ends; Interactive 100 Stumbles After Dot–Com Business Blows Away," *Advertising Age*, May 7, 2001, at S1.) On June 26, 2001, *InternetNews.com* described Seneca as "a complicated effort by ad agency group Omnicom to lessen its losses in the interactive sector." (Hammel Decl. Ex. P4: Christopher Saunders, "Seneca to Absorb Agency.com," *InternetNews.com*, June 26, 2001.) On September 17, 2001, *Fortune* reported that "[John Wren, Omnicom's CEO,] is now getting all the Net assets off Omnicom's books by shoveling them into a private holding company called Seneca." (Hammel Decl. Ex. U3: Patricia Sellers, "Rocking Through The Ad Recession; Omnicom is defying the Madison Avenue slump thanks to its CEO's aggressive, contrarian strategy," *Fortune*, Sept. 17, 2001.) On March 26, 2002, Omnicom filed a Form 10–K disclosing that it had recorded no gain or loss on the Seneca Transaction. (Hammel Decl. Ex. A1: Omnicom Group, Inc.2001 Form 10–K, filed Mar. 26, 2002 at F–13.)

There were no statistically significant changes in Omnicom's stock price after any of these news reports. (Defs. 56.1 Stmt. ¶¶ 203, 205, 207.)

On June 5, 2002, Onmicom filed a Form 8–K which stated that "[o]n May 22, 2002, Robert J. Callander, an outside director (age 72; Board member since 1992), resigned from the Board of Directors." (Hammel Decl. Ex. S4: Omnicom Group Inc. Form 8–K, dated June 5, 2002 at 2.)

On June 6, 2002 rumors of a forthcoming negative *Wall Street Journal* article circulated, and Omnicom's stock price declined. (Expert Report of Scott D. Hakala, Ph.D., CFA dated December 18, 2006 ("Hakala Report") ¶ 70; Corrected Declaration of David R. Hassel dated August 22, 2007 ("Hassel Decl."), Ex. 128: "OMC: The Real Story—Reiterate Buy on OMC," Salomon Smith Barney, June 6, 2002.) The price continued to decline the following day after further speculation that a negative *Wall Street Journal* article was imminent. (Hakala Report ¶ 71; Hassel Decl. Exs. 431: Omnicom Group (OMC), UBS Warburg, June 7, 2002 & 125: Omnicom Group, Inc.: A Rare Buying Opportunity, Merrill Lynch, June 7, 2007.)

On June 11, 2002, the Financial Times reported that in 2001 Omnicom had "struck a 'clever ploy' to avoid taking a hit in last year's accounts for the 'massive' losses sustained by internet companies in which it had invested .... Omnicom's investments were hived off into an investment company called Seneca in exchange for a special type of non-convertible preferred stock. The complex arrangement avoided the need for Omnicom to take a write-down .... [Eventually,] Callander came to question whether the board had approved the Seneca vehicle." (Hammel Decl. Ex. Q4: Richard Tomkins & Christopher Grimes, "Omnicom shares wobble amid disclosure fears," *Financial Times*, June 11, 2002.)

On June 12, 2002, a *Wall Street Journal* article reported that Callander resigned "amid questions about how the company handled a series of soured Internet investments." (Hassel Decl. Ex. 3: Vanessa O'Connell & Jesse Eisinger, "Unadvertised Deals: At an Ad Giant, Nimble Financing Fuels Rapid Growth," *The Wall Street Journal,* June 12, 2002 (the "WSJ Article"), at 1.) The WSJ Article discusses the Seneca Transaction, noting that "[a]mong [its] advantages . . . was that it allowed the company to avoid the possibility of writing down the value of its investments in some of the online firms." (WSJ Article at 1.) It quotes John Wren, Omincom's chief executive officer, as saying, "Seneca was smart because instead of just walking away from these [investments] and taking a write-off, we said we believe that Pegasus, through Seneca, could restructure the assets and make them valuable again," and notes that "Omnicom was [also] able to preclude having to record its proportional share of any losses from Agency.com." (WSJ Article at 4.) The WSJ Article also quotes two accounting professors, who, "based on the public filings on Seneca with the SEC," note that the Seneca Transaction "raises a red flag: Omnicom reported that it unloaded a batch of troubled Internet investments without recording a loss," and "wonder where this fair value is coming from in this environment." (WSJ Article at 4–5.) According to the WSJ Article, after Wren informed the board that he wanted to buy back two of the firms that Seneca had taken private, Callander resigned. (WSJ Article at 1, 5.) Callander reportedly wondered about the purpose of the Seneca Transaction and whether Omnicom executives had engaged in the Seneca Transaction without board approval. (WSJ Article at 1, 5.)

More than a third of the WSJ Article was devoted to negative commentary on previous disclosures by Omnicom concerning the manner in which it reported "organic growth" and its use of "earn-out" deals. (WSJ Article at 2–4.) For example, the WSJ Article reports at length about other "tactics" that "raise[ ] questions" in the post-Enron environment. It states that "Omnicom makes it difficult to evaluate its growth numbers . . . ., us[ing] the term [organic growth] more expansively than its rivals . . . ., [thereby] tending to pump up the organic-growth rate." (WSJ Article at 2–3.) It notes that "if cash spent on acquisitions is subtracted, the company has a negative cash flow." (WSJ Artice at 3.) It also comments that Omnicom's use of earn-out payments "ought to be reported as a compensation expense" and not as acquisition expenses, highlighting that "Omnicom's obligations to make future earn-out payments amount to a substantial potential liability . . . [and] that the company currently owes future payments of $250 million to $350 million." (WSJ Article at 3–4.)

Also on June 12, *Reuters* quoted a SunTrust Robinson Humphrey analyst attributing Omnicom's historic stock price premium to the credibility of its management and noting that "[u]ntil they can regain that credibility on the issues raised in the Journal, they'll probably trade in line with the group." (Hassel Decl. Ex. 125: Adam Pasick, "Update 1–Omnicom defends accounting as stock plunges," *Reuters,* June 12, 2002 at 1–2.) Omnicom's closing price declined from $77.56 on June 11, 2002 to $62.28 on June 12, 2002. (Hammel Decl. Ex. B4: Omnicom Group Inc. Stock Price and Volume Data, CRSP, June 5, 2002– Dec. 31, 2002 at 1.)

On June 13, Omnicom's closing price fell again to $54.62 (Hammel Decl. Ex. B4 at 1), and Plaintiffs filed this action. On that day, a *CBS MarketWatch* article stated, "[t]he article seems to suggest that Omnicom was using . . . Seneca[ ] to cushion

itself from losses related to those investments and avoid write-downs that could bring down its overall numbers." (Hakala Report ¶ 78.) Also on June 13, the Chicago Tribune reported that Omnicom's shares fell after news that Callander resigned "questioning whether certain disclosures were made to the board about the off-loading of certain investments and the buyback of two Internet firms." (Hassel Decl. Ex. 134: Jim Kirk, "Omnicom is counted out on its accounting," *Chicago Tribune*, June 13, 2002; Hakala Report ¶ 78.)

Several research analysts commented that the WSJ Article had not revealed any new information. Merrill Lynch commented that "[t]here was no new information in the article and nothing in the article changes our opinion of the company .... In the current market environment, where investors are inclined to sell on the hint of any impropriety, we are not surprised on the volatility on the shares." (Hammel Decl. Ex. M4: Lauren R. Fine, "Good News: No New News in WSJ Article." Merrill Lynch, June 12, 2002.) Bear Stearns noted, "[w]hile there were no new issues raised, the negative tone of the article clearly destroyed a lot of confidence in the stock." (Hammel Decl. Ex. J4: Alexia S. Quadrani, "Follow–Up on WSJ Article," Bear Stearns, June 13, 2002.) UBS Warburg wrote that "[o]verall we believe that the contents of the [WSJ Article] was not new information." (Hammel Decl. Ex. E3: Catherine Kim, "Omnicom, Still the Leader, Reiterating Buy," UBS Warburg, June 13, 2002.) Lehman Brothers also commented that "[o]verall, yesterday's Wall Street Journal article did not bring up any substantial 'new' issues." (Hassel Decl. Ex. 436: Kevin Sullivan, "Omnicom Group, Sifting through the Issues," Lehman Brothers, June 13, 2002.)

Smith Barney stated, "[w]e believe the company is an unfortunate victim of an overzealous and highly biased reporter and the context of the accounting environment." (Hammel Decl. Ex. K4: William G. Bird, "OMC: Comments on Management Meeting," Salomon Smith Barney, June 13, 2002.) *The Deal.com* characterized the WSJ Article as a "hatchet job," noting "[m]edia arrogance and investor ignorance collided as never before on Madison Avenue last week, causing the stock of Omnicom Group Inc. to crash 30%." (Hammel Decl. Ex. 14: Richard Morgan, "Industry Insight: Hatchet Job," *The Deal.com*, June 14, 2002.)

On June 14, PNC Advisors removed Omnicom from its "Advantage Portfolios" and lowered its price target for Omnicom shares. (Hakala Report ¶ 81.) A Morgan Stanley report that day noted that " '[r]eputation risk' is the latest concern." (Hakala Report ¶ 81.) On June 24, Standard & Poor's placed Omnicom's debt on a Negative Credit Watch because it was "concerned about the recently filed shareholder lawsuits and the SEC's request for information about two independent board members' departures." (Hakala Report ¶ 83.) There were also reports of additional shareholder lawsuits. (Hakala Report ¶ 83.) The share price further declined that day and the next. (Hakala Report ¶ 83.) A June 16, 2002 *Financial Times* article reported that the market, "[f]earful of another Enron or Tyco International ..., hit the panic button, wiping out 36 per cent of [Omnicom's] share price" even though "no evidence of impropriety has emerged." (Hammel Decl. Ex. H4: Richard Tomkins, "Omnicom in Market for Damage Limitation," *Financial Times*, June 16, 2002.)

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is warranted "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir.1997). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. An issue of fact is "material" if it might "affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Shade v. Hous. Auth. of New Haven*, 251 F.3d 307, 314 (2d Cir. 2001). Where it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight," summary judgment should be granted. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994).

## II. *10b–5 Claims*

■ Loss causation is a necessary element in a 10b–5 claim. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). The "logical link between [an] inflated share purchase price" resulting from an alleged misstatement "and any later economic loss is not invariably strong" because "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations,

new industry-specific or firm-specific facts, conditions or other events." *Dura*, 544 U.S. at 342–43, 125 S.Ct. 1627. The burden of establishing loss causation rests on the plaintiff. 15 U.S.C. § 78u–4(b)(4). Loss causation can be established either where (1) the market reacted negatively to a corrective disclosure or (2) the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused plaintiffs' loss. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir.2005).

### A. *Corrective Disclosure*

■ This is not a case about materialization of an undisclosed risk. Thus, the absence of a corrective disclosure would be "fatal under Second Circuit precedent." *Lentell*, 396 F.3d at 173–75. *Dura* does not require that a corrective disclosure "take a particular form or be of a particular quality .... It is the exposure of the falsity of the fraudulent representation that is the critical component of loss causation." *In re Winstar Comm'ns*, No. 01 Civ. 3014(GBD), 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006); *see also Lentell* 396 F.3d at 177. While a disclosure need not reflect every detail of an alleged fraud, it must reveal some aspect of it. *See, e.g., In re ICG Commc'ns, Inc. Sec. Litig.*, No. 00 Civ. 01864, 2006 WL 416622, at *10 (D.Colo. Feb. 7, 2006) (allegations of corrective disclosure as to one of several claims sufficed to survive motion to dismiss all claims); *In re Retek Inc. Secs.*, No. 02 Civ. 4209, 2005 WL 3059566, at *4 (D.Minn. Oct. 21, 2005) (internal citation omitted) (same). Moreover, the disclosed fact must be new to the market. *See Joffee v. Lehman Bros., Inc.*, 410 F.Supp.2d 187, 191 (S.D.N.Y.2006) (dismissing action where "each of the matters that Plaintiffs claim [Defendant] failed to disclose had, in fact, been disclosed to the market").

■ A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure. *Teachers' Retirement Sys. of La. v. Hunter*, 477 F.3d 162, 187 (4th Cir.2007) (rejecting a corrective disclosure that "merely attributes an improper purpose to ... previously disclosed facts"); *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir.2005) (*Wall Street Journal*'s interpretation of previously disclosed facts is not a corrective disclosure). Indeed, if markets react negatively to a characterization, the "loss is caused by the subsequent characterization of the transaction," not by the transaction itself. *In re Cree, Inc. Secs. Litig.*, No. 03 Civ. 0549, 2005 WL 1847004, at *12 (M.D.N.C. Aug. 2, 2005), *aff'd by Hunter*, 477 F.3d 162.

Plaintiffs assert that information disclosing Defendants' alleged fraud was released to the market on June 6, 7, 12, 13, 24 and 25, 2002. (Lead Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, dated Aug. 20, 2007 at 34.) Disclosures to the market during this time contain the following information: (1) commentary on Omnicom's accounting with respect to organic growth and earn-outs; (2) the conclusion that the Seneca Transaction allowed Omnicom to avoid taking a write-off for its troubled e-service investments; (3) the opinion of one accounting professor that Omnicom's failure to record any loss "raises a red flag," and another professor's skepticism about the value of the e-service investments given "the current environment;" (4) that Omnicom intended to unwind Seneca by buying back Agency and Organic; and (5) that Callander resigned because he was concerned about the purpose of the Seneca Transaction and that it had not been adequately disclosed to Omnicom's board.

First, the parties agree that no new facts were disclosed concerning Omnicom's reporting of organic growth and earn-outs. Second, the market knew well in advance of June 2002 that Omnicom's internet assets were ailing and that it transferred them to Seneca without recording a loss. Indeed, contemporaneous news articles reported that the Seneca Transaction was "a way for Omnicom to get struggling stocks off of its books" (Hammel Decl. Ex. O4), "a complicated effort by ad agency group Omnicom to lessen its losses in the interactive sector" (Hammel Decl. Ex. P4), and a way of "getting all the Net assets off Omnicom's books by shoveling them into a private holding company called Seneca" (Hammel Decl. Ex. U3). Moreover, Omnicom's March 2002 10–K discloses that it recorded no loss on the Seneca Transaction. (Hammel Decl. Ex. A1 at F–13.) Third, that an accounting professor presented with the fact that Omnicom transferred its internet investments without recording a loss sees a "red flag" or "wonder[s]" about valuation is similarly not a disclosure of any new fact. Rather, it is an observation based on facts already in the market. *See In re Merck*, 432 F.3d at 270 (noting that the efficient market hypothesis suggests that basic calculations are made upon disclosure of underlying facts); *In re Winstar*, 2006 WL 473885, at *15 (relevant question is whether a "reasonable investor could have drawn those same conclusions based on the total mix of the available information"). Accordingly, the only new facts reported to the market in June 2002 were that Omnicom intended to unwind Seneca by buying back Agency and Organic and Callander's resignation. The Court addresses each in turn.

■ First, where a disclosure does not reveal the falsity of the alleged misstatements, it does not qualify as "corrective." A decision to reverse course, particularly in a dynamic business environment, does not imply that the earlier business strategy was a subterfuge. *See, e.g., Lentell,*

396 F.3d at 177 (downgrading recommendation from "buy" to "neutral" does not reveal falsity of "buy" rating and therefore is not "corrective"). Accordingly, the mere fact that Omnicom later decided to buy back Agency and Organic does not suggest that the original transaction spinning them off was a sham. Therefore, the disclosure of this information—the announcement of the reacquisition of Agency and Organic—is not "corrective."

■ Second, a director's resignation cannot constitute a corrective disclosure when the resignation is not connected to the alleged fraud. *See In re Buca Inc. Sec. Litig.*, No. 05 Civ. 1762(DWF) (AJB), 2006 WL 3030886, at *9 (D.Minn. Oct. 16, 2006) (press release disclosing director's resignation "mentioned no investigation or accounting issues and thus disclosed nothing of the alleged fraud"). It follows that a disclosure attributing a director's resignation to reasons other than the fraud alleged by plaintiffs similarly does not disclose the alleged fraud. Here, coverage of Callander's resignation attributed his departure to two things: his concern that the board did not approve the Seneca Transaction and questions about the purpose of the Seneca Transaction. As to the first, there is no allegation that the board did not approve the Seneca Transaction. Second, mere attribution of an improper purpose to a previously disclosed transaction cannot constitute a corrective disclosure. *Hunter*, 477 F.3d at 187 (securities fraud action filed by company's founder not a corrective disclosure where it "disclose[d] nothing new, but merely attribute[d] an improper purpose to the previously disclosed facts").

Accordingly, this Court is not persuaded that Plaintiffs have presented facts sufficient to support finding a corrective disclosure. This conclusion is consistent with the analyst coverage by Merrill Lynch, Bear Stearns, UBS Warburg and Lehman Brothers, all of which noted that the WSJ Article had disclosed nothing new. (Hammel Decl. Exs. M4, J4, E3; Hassel Decl. Ex. 436.)

## B. *Market Reaction*

■ Even assuming Plaintiffs could establish that news about Callander's resignation or Omnicom's plans to repurchase Agency and Organic were corrective disclosures, Plaintiffs nevertheless cannot demonstrate that the market reacted negatively to the disclosures, rather than to other information simultaneously released to the market. To prove loss causation, plaintiffs must distinguish the alleged fraud from the "tangle of [other] factors" that affect a stock's price. *Dura*, 544 U.S. at 343, 125 S.Ct. 1627. While plaintiffs need not quantify the fraud-related loss, they must "ascribe some rough proportion of the whole loss to [the alleged] misstatements." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir.2007) ("Plaintiffs have not alleged facts to show that [defendant]'s misstatements, among others ... that were much more consequential and numerous, were the proximate cause of plaintiffs' loss ...."); *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377(LAK), 2007 WL 1438753, at *2 (S.D.N.Y. May 16, 2002) (granting summary judgment where plaintiffs presented no evidence to "show whether any loss (and if so how much) was caused by defendants' conduct as opposed to other market factors"); *see also Lentell*, 396 F.3d at 177 (where both disclosed and concealed risks materialized to cause a loss, "plaintiffs must allege (i) facts sufficient to support an interference that it was defendants fraud—rather than other salient factors— that proximately caused plaintiffs' loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk").

It is clear that a characterization of previously disclosed facts can cause a loss, just not one attributable to the alleged fraud. *In re Merck*, 432 F.3d at 270; *Hunter*, 477 F.3d at 187. Accordingly, negative characterizations are among the "tangle of factors" that plaintiffs must distinguish to prove that any loss was caused by the alleged fraud. *Dura*, 544 U.S. at 343, 125 S.Ct. 1627. Here, in addition to any shreds of new information, the WSJ Article and ensuing coverage included highly negative commentary about facts already known to the market. Indeed, the *Financial Times, the Deal.com*, and Salomon Smith Barney blamed Omnicom's stock price decline on the general tone of the WSJ article and post-Enron investor skittishness, and not on the slivers of new Seneca-related information released in 2002 (Hammel Decl. Ex. H4, I4 & K4); and other analysts commented on the article's impact while noting that it revealed nothing new (Hammel Decl. Exs. M4, J4 & E3; Hassel Decl. Ex. 436).

Plaintiffs' economist Scott D. Hakala ("Hakala") undertook an event study to isolate the effect of Plaintiffs' identified disclosures on Omnicom's stock price from that of other market forces. Assuming for the purposes of this motion that the event study is adequate in that regard, it nevertheless fails to demonstrate loss causation. First, as discussed above, the event study at best incorrectly identifies several corrective disclosures, and at worst fails to identify any at all. Second, to the extent that any corrective disclosures exist, the event study does not isolate their effect on Omnicom's stock price from that of the negative reporting, which dwarfed any shreds of new information disclosed in June 2002. Hakala writes, "[w]hile the article also reasserted concerns regarding Omnicom's organic growth, cash flow, put obligations and earn-outs, those issues had previously been identified and fully [*sic*] in analyst and news reports ... well before

[the WSJ Article]." (Hakala Report ¶ 76.) Thus, Hakala fails to acknowledge any potential effect from WSJ Article's highly negative tone. Nor does Hakala analyze the effect of post-Enron "changed investor expectations" on Omnicom's stock price. *See Dura*, 544 U.S. at 342–43, 125 S.Ct. 1627 (including "changed investor expectations" among the "tangle of factors" that might cause a loss). Because the law requires the disaggregation of confounding factors, disaggregating only *some* of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss. *See Lattanzio*, 476 F.3d at 158 (dismissing action where plaintiffs failed to allege that defendant's misstatements, rather than others that were "more consequential and numerous," were the proximate cause of their loss). Thus, there is simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss. Accordingly, Defendants' motion for summary judgment on Plaintiffs' 10b–5 claims is granted.

### III. *Section 20(a) Claims*

Section 20(a) of the Exchange Act provides for control person liability "to the same extent as" the controlled entity that committed the violation. 15 U.S.C. § 78t(a). As stated above, Plaintiffs have failed to establish any underlying primary violation of federal securities law. Accordingly, Defendants' motion for summary judgment is granted on Plaintiffs' § 20 claims as well. *See Dresner v. Utility.com, Inc.*, 371 F.Supp.2d 476, 501 (S.D.N.Y.2005) (dismissing § 20(a) claim where plaintiffs failed to establish any underlying liability); *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 272 F.Supp.2d 243, 264 (S.D.N.Y.2003) (same).

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Docket

No. 144) is granted. The Clerk of Court is directed to terminate all motions pending as of January 29, 2008 and close the case.

SO ORDERED.